Filed 9/28/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
|    Plaintiff and Respondent, | G054674 |
|       v. | (Super. Ct. No. 16CF0837) |
| ERIC JASON FRAHS, | O P I N I O N |
|    Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Glenn R. Salter, Judge. Judgment conditionally reversed and remanded as directed. Respondent's request for judicial notice denied.

Susan L. Ferguson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Matthew Mulford, Marilyn George and Steve Oetting, Deputy Attorneys General, for Plaintiff and Respondent.

\*       \*       \*

Defendant Eric Jason Frahs tried to steal a can of beer and an energy drink from a small store. As he was leaving, Frahs got into a physical confrontation with the store owner and his son. At a jury trial on two robbery charges, Frahs put on evidence that he suffers from a form of schizophrenia. The jury found defendant guilty. In a subsequent bench trial, the court found that Frahs had suffered a prior "strike" conviction (an assault with a deadly weapon) and imposed a nine-year prison sentence.

While Frahs' case was pending on appeal in this court, the Legislature enacted Penal Code section 1001.36, which created a pretrial diversion program for defendants with mental disorders.[1] Frahs argues that the mental health diversion program should apply retroactively. We agree and conditionally reverse Frahs' convictions and sentence. On remand, the trial court may consider granting Frahs mental health diversion as we will discuss more fully in this opinion. However, we reject Frahs' remaining claim that his prior assault conviction does not qualify as a strike.

I

FACTS AND PROCEDURAL BACKGROUND

On March 31, 2016, at about 8:00 a.m., Frahs entered a small market in Santa Ana. J. Kim, the store's owner, refused to sell Frahs a beer; a week earlier Frahs had tried to steal a pack of cigarettes. Frahs went outside of the store and began picking up rocks and throwing them at cars that were passing by. Frahs then reentered the store and walked towards the cooler. Frahs grabbed a can of beer and a can of Red Bull. Kim and his son stood at the front door in order to block Frahs from leaving. Frahs rushed towards the door and tried to push his way through. During the ensuing confrontation, Kim was hit in the head and fell down. Frahs eventually got out of the store, but Kim and

---

[1] Any further undesignated statutory references are to the Penal Code.

2

his son were able to detain Frahs in the parking lot and call the police.

*Court Proceedings*

In June 2016, the prosecution filed an information alleging that Frahs had committed two counts of second degree robbery and one felony count of throwing substances (rocks) at a motor vehicle. (§§ 211, 211.5; Veh. Code, § 23110, subd. (b).) The information further alleged that Frahs had previously been convicted of a "strike," an assault with a deadly weapon offense in 2015. (§ 245, subd. (a)(1).)

Frahs testified in his own defense. Frahs said that in his early twenties he began hallucinating and experiencing delusions (he was 30 years old at the time of the trial). Frahs said that he thought his computer hard drive and birds were talking to him. Frahs testified that he has been hospitalized about eight times. Frahs said that he had been homeless for about two years, and every time he has been in trouble with the law it was due to his mental health issues. Frahs testified that just before entering the market, he thought an angel had flown by on a horse and talked to him.

Dr. Richard Lettieri, a clinical and forensic psychologist, testified that he had reviewed a report from a hospital where Frahs had been confined. Lettieri said that most psychiatric patients are temporarily confined for only three to 14 days to stabilize them on medication; however, Frahs had been confined for about four months, which indicates that Frahs had been very ill and very unstable. Lettieri testified that Frahs had been diagnosed with schizoaffective disorder, which is "a combination of schizophrenia and bipolar disorder." Lettieri said that Frahs had been prescribed various medications over the years to include "antidepressants, mood stabilizers, and antipsychotics."

The jury found Frahs guilty of the two second degree felony robbery counts and a lesser-included misdemeanor charge. After the jury trial, the court conducted a

3

bench trial on the prior serious felony assault "strike" allegation, which the court found to be true. The court imposed a prison sentence of nine years, which included a sentence enhancement (low term doubled) for the alleged prior strike conviction.

II

DISCUSSION

Frahs contends that the recently enacted section 1001.36, which now allows for the diversion of defendants with mental disorders, applies retroactively. Frahs also contends that his prior conviction for an assault with a deadly weapon was not a strike because a broken beer bottle is not an "inherently" deadly weapon.

We shall address each contention in turn.

## A. Retroactivity of section 1001.36

Generally, pretrial diversion is the suspension of criminal proceedings for a prescribed time period, subject to certain conditions. (See, e.g., §§ 1000.1 [diversion for specified drug offenses], 1001.60 [bad check diversion], 1001.70 [parental diversion], 1001.80 [military diversion].) Ordinarily, when a defendant successfully completes a diversion program, the criminal charges are dismissed and the defendant may legally answer that he or she has never been arrested for—or charged with—the diverted offense, subject to certain exceptions. (See also, e.g., §§ 1001.9, 1001.33, 1001.55.)

### 1. Mental Health Diversion

Effective June 27, 2018, the Legislature created a diversion program for defendants with diagnosed and qualifying mental disorders such as schizophrenia, bipolar disorder, and posttraumatic stress disorder. (§ 1001.36, subd. (a).) One of the stated purposes of the legislation was to promote "[i]ncreased diversion of individuals with

4

mental disorders . . . while protecting public safety." (§ 1001.35, subd. (a).)[2] "As used in this chapter, 'pretrial diversion' means the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication . . . ." (§ 1001.36, subd. (c).)

"On an accusatory pleading alleging the commission of a misdemeanor or felony offense, the court may, after considering the positions of the defense and prosecution, grant pretrial diversion . . . if the defendant meets all of the requirements . . . ." (§ 1001.36, subd. (b).) There are six requirements. First, the court must be "satisfied that the defendant suffers from a mental disorder" listed in the statute. (§ 1001.36, subd. (b)(1).) Second, the court must also be "satisfied that the defendant's mental disorder played a significant role in the commission of the charged offense." (§ 1001.36, subd. (b)(2).) Third, "a qualified mental health expert" must opine that "the defendant's symptoms motivating the criminal behavior would respond to mental health treatment." (§ 1001.36, subd. (b)(3).) Fourth, subject to certain exceptions, the defendant must consent to diversion and waive his or her right to a speedy trial. (§ 1001.36, subd. (b)(4).) Fifth, the defendant must agree "to comply with the treatment as a condition of diversion." (§ 1001.36, subd. (b)(5).) And finally, the court must be "satisfied that the defendant will not pose an unreasonable risk of danger to public safety . . . if treated in the community." (§ 1001.36, subd. (b)(6).)

If a trial court determines that a defendant meets the six requirements, then the court also must also determine whether "the recommended inpatient or outpatient program of mental health treatment will meet the specialized mental health treatment needs of the defendant." (§ 1001.36, subd. (c)(1)(A).) The court may then grant diversion and refer the defendant to an approved treatment program. (§ 1001.36, subd.

---

[2] Respondent's request for judicial notice of the legislative history of Assembly Bill No. 1810 is denied. The material is not necessary in order to resolve the legal issues on appeal.

5

(c)(1)(B).) Thereafter, the provider "shall provide regular reports to the court, the defense, and the prosecutor on the defendant's progress in treatment." (§ 1001.36, subd. (c)(2).) "The period during which criminal proceedings against the defendant may be diverted shall be no longer than two years." (§ 1001.36, subd. (c)(3).)

If the defendant commits additional crimes, or otherwise performs unsatisfactorily in diversion, then the court may reinstate criminal proceedings. (§ 1001.36, subd. (d).) However, if the defendant performs "satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings." (§ 1001.36, subd. (e).)

### 2. *The Rules Regarding Retroactivity*

In general, statutes are presumed to apply prospectively unless they state otherwise. (See § 3.) However, the presumption against retroactivity does not apply when the Legislature reduces the punishment for criminal conduct. (*In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*).) The Supreme Court's reasoning in *Estrada* is that when a statute reduces or ameliorates the punishment, it is presumed that the Legislature has determined the offense no longer merits the greater punishment, and this rationale applies even if the defendant was convicted and sentenced before the statute became effective. (*Id.* at pp. 744-745, 748 ["where the amendatory statute mitigates punishment and there is no savings clause, the rule is that the amendment will operate retroactively"].)

The scope of the *Estrada* rule was recently considered in *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299 (*Lara*). In *Lara*, the prosecution initially filed charges in "adult" criminal court against defendant Lara, who was 14 and 15 years old at the time of the alleged sex offenses. (*Id.* at p. 303.) But as a consequence of the intervening passage of Proposition 57, a district attorney can no longer directly file charges against juveniles in criminal court. (*Lara*, at p. 303.) As it stands now, a district attorney may seek to transfer a case from a juvenile court to an "adult" criminal court, but

the charges must first be filed in juvenile court. (*Ibid*.) It is now exclusively for the juvenile court to determine whether the minor should be transferred to criminal court. (*Ibid*.) In *Lara*, the Supreme Court held that while Proposition 57 did not mitigate punishment for any particular crime as in *Estrada*, *supra*, 63 Cal.2d 740, Proposition 57 did confer potential benefits to juveniles accused of crimes and constitutes an "'ameliorative change[] to the criminal law' that . . . the legislative body intended 'to extend as broadly as possible.'" (*Lara*, *supra*, 4 Cal.5th at pp. 303-304, 308-309.) Thus, the Court concluded that the Legislature intended Proposition 57 to apply retroactively "to all juveniles charged directly in adult court" such as Lara, "whose judgment was not final at the time it was enacted." (*Lara*, at p. 304.)

### 3. Retroactivity Analysis

Here, similar to Proposition 57, the mental health diversion program under section 1001.36 does not lessen the punishment for a particular crime. However, for a defendant with a diagnosed mental disorder, it is unquestionably an "ameliorating benefit" to have the opportunity for diversion—and ultimately a possible dismissal— under section 1001.36. Further, it appears that the Legislature intended the mental health diversion program to apply as broadly as possible: "The purpose of this chapter is to promote . . . . [¶] (a) *Increased diversion* of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety." (§ 1001.35, subd. (a), italics added.)

Applying the reasoning of the Supreme Court, we infer that the Legislature "must have intended" that the potential "ameliorating benefits" of mental health diversion to "apply to every case to which it constitutionally could apply." (See *Estrada*, *supra*, 63 Cal.2d at pp. 744-746.) Further, Frahs' case is not yet final on appeal and the record affirmatively discloses that he appears to meet at least one of the threshold requirements

(a diagnosed mental disorder). Therefore, we will direct the trial court on remand to make an eligibility determination regarding diversion under section 1001.36.

The Attorney General argues that: "Subdivision (c) of the statute defines 'pretrial diversion' as the 'postponement or prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication.' This language indicates the Legislature did not intend to extend the potential benefits of . . . section 1001.36" as broadly as possible. We disagree. The fact that mental health diversion is available only up until the time that a defendant's case is "adjudicated" is simply how this particular diversion program is ordinarily designed to operate. Indeed, the fact that a juvenile transfer hearing under Proposition 57 ordinarily occurs prior to the attachment of jeopardy, did not prevent the Supreme Court in *Lara*, *supra*, 4 Cal.5th 299, from finding that such a hearing must be made available to all defendants whose convictions are not yet final on appeal.

Here, although Frahs' case has technically been "adjudicated" in the trial court, his case is not yet final on appeal. Thus, we will instruct the trial court—as nearly as possible—to retroactively apply the provisions of section 1001.36, as though the statute existed at the time Frahs was initially charged.

### 4. Instructions on Remand

In *Lara*, after determining that Proposition 57 applied retroactively, the Supreme Court then went on to endorse a remand procedure described by this court in *People v. Vela* (2018) 21 Cal.App.5th 1099 (*Vela* ). (*Lara*, *supra*, 4 Cal.5th at p. 313 ["we believe remedies like those provided in *Vela* . . . are readily understandable, and the courts involved can implement them without undue difficulty"].)

The remand procedure we outlined in *Vela* was as follows: "Vela's conviction and sentence are conditionally reversed and we order the juvenile court to conduct a juvenile transfer hearing. [Citation.] When conducting the transfer hearing,

8

the juvenile court shall, to the extent possible, treat the matter as though the prosecutor had originally filed a juvenile petition in juvenile court and had then moved to transfer Vela's cause to a court of criminal jurisdiction. [Citation.] If, after conducting the juvenile transfer hearing, the court determines that it would have transferred Vela to a court of criminal jurisdiction because he is 'not a fit and proper subject to be dealt with under the juvenile court law,' then Vela's convictions are to be reinstated. [Citation.] The court is to resentence Vela consistent within the bounds of its discretion as discussed within the following section of this opinion. On the other hand, if the juvenile court finds that it would *not* have transferred Vela to a court of criminal jurisdiction, then it shall treat Vela's convictions as juvenile adjudications and impose an appropriate 'disposition' within its discretion." (*Vela*, *supra*, 21 Cal.App.5th at p. 1113.)

In this case, similar to our disposition in *Vela*, we conditionally reverse Frahs' convictions and sentence. On remand, the trial court is to conduct a mental health diversion eligibility hearing under the applicable provisions of section 1001.36. When conducting the eligibility hearing, the court shall, to the extent possible, treat the matter as though Frahs had moved for pretrial diversion after the charges had been filed, but prior to their adjudication. (§ 1001.36, subd. (c).)

If the trial court finds that Frahs suffers from a mental disorder, does not pose an unreasonable risk of danger to public safety, and otherwise meets the six statutory criteria (as nearly as possible given the postconviction procedural posture of this case), then the court may grant diversion. If Frahs successfully completes diversion, then the court shall dismiss the charges. However, if the court determines that Frahs does not meet the criteria under section 1001.36, or if Frahs does not successfully complete diversion, then his convictions and sentence shall be reinstated. The judgment shall include the prior "strike" conviction, as stated in the next section of this opinion.

9

*B. Prior Strike Conviction*

The prosecution is required to prove a prior strike conviction beyond a reasonable doubt, and when a defendant challenges the decision, we ordinarily review the record for substantial evidence. (*People v. Delgado* (2008) 43 Cal.4th 1059, 1065 (*Delgado*).) However, the definition of terms within a particular statute is a question of statutory interpretation, which we review de novo. (*People v. Willliams* (2010) 184 Cal.App.4th 142, 146.)

Under the "Three Strikes" sentencing scheme, a defendant's punishment for a felony conviction is ordinarily doubled when the prosecution has alleged and proven a prior conviction for a crime designated as either a "violent felony" or a "serious felony." (§§ 667.5, subd. (c), 1192.7, subd. (c).) One of the crimes designated as a serious felony is an "assault with a deadly weapon." (§ 1192.7, subd. (c)(31).)

The term "assault" is defined by statute: "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (§ 240.) The crime is punished in a variety of ways depending on the severity of the offense. A misdemeanor (or simple) assault is punishable by up to six months in jail. (§ 241.) An assault with a deadly weapon can be punished as either a misdemeanor or a felony (a wobbler): "Any person who commits an assault upon the person of another with *a deadly weapon or instrument other than a firearm* shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment." (§ 245, subd. (a)(1), italics added.)

What constitutes "a deadly weapon or instrument other than a firearm" is not defined within the statute. (See § 245, subd. (a)(1).) However, the definition is well settled under case law. "As used in section 245, subdivision (a)(1), a '*deadly weapon*' is 'any object, *instrument*, or weapon which is used in such a manner as *to be capable of*

10

producing and likely to produce, death or great bodily injury.'" [3] (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028-1030, italics added [hands or feet are not a deadly weapon, a deadly weapon is "extrinsic to the body"].)

Therefore, the question of what constitutes "a deadly weapon or instrument other than a firearm" is ordinarily a question of fact. (§ 245, subd. (a)(1); see CALCRIM No. 860 ["A *deadly weapon* is any object, instrument, or weapon that is inherently deadly or one that is used in such a way that it is capable of causing and likely to cause death or great bodily injury"]; see also, e.g., *People v. McCoy* (1944) 25 Cal.2d 177, 188 [a knife, though not inherently deadly, was a deadly weapon as it was used]; *In re Brandon T.* (2011) 191 Cal.App.4th 1491, 1497 [a butter knife was not a deadly weapon where the minor only caused a small scratch to the victim's cheek]; *People v. Page* (2004) 123 Cal.App.4th 1466, 1472 [a pencil was a deadly weapon where defendant held it up to the victim's throat and threatened to stab him].)

The prosecution filed a felony complaint in 2015, which alleged that Frahs had committed "an assault upon the person of John Doe with a deadly weapon and instrument, [a] broken beer bottle." Frahs pleaded guilty and agreed to be placed on formal probation. Frahs signed a plea form and initialed a paragraph that read: "I understand that my conviction in this case is for a serious or violent felony ('strike') which may result in . . . substantially increased penalties, and a term in state prison for any future felony conviction." Frahs also initialed a paragraph that read: "I willfully and unlawfully committed an assault upon the person of John Doe with a broken beer bottle." (§ 245, subd. (a)(1).)

Here, the trial court was presumably unaware of the underlying facts of the 2015 assault conviction during the bench trial. But Frahs had admitted on the plea form a factual basis for his plea. Further, Frahs had pleaded guilty to violating section 245,

---

[3] Frahs attempts to draw a distinction between "deadly weapon" and "instrument," but the terms are used interchangeably within the statute and throughout the relevant cases.

subdivision (a)(1): "an assault upon the person of another with a deadly weapon or instrument other than a firearm." (See *People v. Ward* (1967) 66 Cal.2d 571, 574 ["A guilty plea amounts to an admission of every element of the crime and is the equivalent of a conviction"].) Moreover, Frahs had acknowledged that he was pleading to a strike. Thus, there was substantial evidence to support the court's true finding on the prior strike conviction. (§ 1192.7, subd. (c)(31) ["an assault with a deadly weapon"].)

Frahs argues that the meaning of "deadly weapon" only applies to "inherently" deadly weapons. He then goes on to argue that a broken beer bottle does not qualify as an inherently deadly weapon. But no statute states that a deadly weapon must be "inherently" deadly. And Frahs cites no case law in support of this proposition.

We must therefore adhere to the long-standing definition of "deadly weapon" as stated by our Supreme Court. (See *People v. Aguilar*, *supra*, 16 Cal.4th at pp. 1028-1029 ["a 'deadly weapon' is 'any object, instrument, or weapon which is used in such a manner as to be capable of producing and likely to produce, death or great bodily injury'"]; see also *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Under the doctrine of *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction"].) Indeed, the cases cited by Frahs generally concern an unrelated issue regarding an earlier version of section 245, subdivision (a)(1). (See, e.g., *Delgado*, *supra*, 43 Cal.4th 1059.)

In *Delgado*, *supra*, 43 Cal.4th at page 1065, a jury convicted defendant of second degree robbery and related offenses. In a bench trial, the prosecution alleged that defendant had a prior serious felony conviction for an assault under section 245, subdivision (a)(1). (*Delgado*, at p. 1065.) At that time, there were two separate assault crimes included under subdivision (a)(1). One offense included "all assaults committed with a deadly weapon other than a firearm," the other offense included all assaults committed by "'means of force likely to produce great bodily injury.'" (*Id.* at pp. 1065, 1067.) The Supreme Court held that because it could not determine precisely which

12

offense the defendant had committed, the trial court's finding of "an assault with a deadly weapon" could not stand. (*Id.* at pp. 1065-1073.)

In 2011 though, "the Legislature amended section 245, removing assaults 'by any means of force likely to produce great bodily injury' from subdivision (a)(1), and placing the language in newly added subdivision (a)(4) of section 245." (*People v. Puerto* (2016) 248 Cal.App.4th 325, 330 (*Puerto*).) In *Puerto*, the defendant made the same claim that Frahs is advancing in this appeal (that his prior section 245, subdivision (a)(1), conviction was not a strike). But the appellate court held that the defendant's "reliance on *Delgado* is misplaced because that case concerned a version of section 245[, subdivision] (a)(1) that was not in effect when defendant committed his prior assault offense." (*Puerto*, at p. 329.) The *Puerto* court concluded that: "Defendant pleaded . . . to 'commit[ting] an assault upon the person of another with a deadly weapon or instrument other than a firearm.' The version of section 245[, subdivision] (a)(1) in effect when defendant committed the assault to which he pleaded . . . in 2013 *could not be violated in a way that did not constitute a serious felony* under section 1192.7, subdivision (c)(31). Accordingly, sufficient evidence supports the trial court's prior strike conviction finding." (*Id*. at p. 331, italics added.)

We agree with the rationale and holding of the Second District Court of Appeal in *Puerto*, *supra*, 248 Cal.App.4th 325. Here, as in *Puerto*, Frahs committed an assault with a deadly weapon after the Legislature's 2011 amendment of section 245. Thus, just as in *Puerto*, Frahs could not have committed the assault "*in a way that did not constitute a serious felony* under section 1192.7, subdivision (c)(31). Accordingly, sufficient evidence supports the trial court's prior strike conviction finding." (*Puerto*, *supra*, 248 Cal.App.4th at p. 331, italics added.)

### III

### DISPOSITION

The judgment is conditionally reversed.  The cause is remanded to the superior court with directions to conduct a diversion eligibility hearing, as discussed within this opinion, no later than 90 days from the filing of the remittitur.

If the trial court determines that Frahs qualifies for diversion under section 1001.36, then the court may grant diversion.  If Frahs successfully completes diversion, then the trial court shall dismiss the charges.  However, if the court determines that Frahs is ineligible for diversion, or Frahs does not successfully complete diversion, then his convictions and sentence shall be reinstated.


MOORE, ACTING P. J.

WE CONCUR:


FYBEL, J.


THOMPSON, J.

14